UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MSO IP HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SEARS CANADA INC.,<br><br>Defendant. | 07 Civ. 9840 (DLC)<br><br>**AMENDED COMPLAINT<br>AND JURY DEMAND** |



MSO IP Holdings, Inc. ("MSO"), by its attorneys, Paul, Weiss, Rifkind,

Wharton & Garrison LLP, for its amended complaint, alleges as follows:

### Nature of the Action

1.       This is an action for breach of contract, for the collection of

monies due and owing, and for declaratory judgment.

2.       MSO and Sears Canada Inc. ("Sears Canada") are parties to a

License Agreement dated April 27, 2002 (the "License Agreement").  Pursuant to the

Agreement, MSO licenses Sears Canada to use the trademark "Martha Stewart Everyday"

(the "Trademark") and other rights in connection with the design, sourcing, distribution,

promotion, and sale of retail merchandise in Canada.  Since on or about September 1,

2003, sales of Martha Stewart branded merchandise by Sears Canada have exceeded

$100 million CAD.

3.       In exchange for its license, Sears Canada is obligated to pay MSO

royalties.  On September 28, 2007, Sears Canada was required to pay MSO an amount of

$1,821,181.37 CAD, representing royalties due and owing under the License Agreement.

Sears Canada failed and refused to pay that amount when due.  Sears Canada further

indicated that it would fail and refuse to perform its obligations to pay subsequent

royalties due and owing under the License Agreement. Sears Canada is obligated to pay

MSO in excess of $3.39 million CAD in guaranteed royalties over the remainder of the

term of the License Agreement.

        4.      On November 8, 2007, only after this action was initiated, and in

acknowledgment of its September 28, 2007 payment obligation, Sears Canada released a

payment to MSO in the amount of $1,731,746.36 USD. However, since the applicable

exchange rate on November 8, 2007 was $1 CAD = $1.0939 USD, Sears Canada was

obligated to pay MSO the sum of $1,821,181.37 CAD x 1.0939 = $1,992,190.30 USD.

Therefore, the payment released on November 8, 2007 reflected a shortfall of

$260,443.94 USD from the amounts due and owing to MSO, which Sears Canada

continues to improperly withhold. Of the improperly withheld amount, Sears Canada is

obligated to (i) remit $182,118.14 CAD to the Canadian tax authorities for withholding

taxes on behalf of MSO (which amount reflects 10% of the gross royalty payment due to

MSO described above); and (ii) remit to MSO $61,224.91 USD (which is the difference

between the $260,443.94 USD owed MSO, less the value of the tax withholding payment

that should be made on MSO's behalf to the Canadian tax authorities ($199,219.03 US)).

        6.      In connection with its failure and refusal to pay royalties both

presently due and in the future, Sears Canada has advanced allegations that MSO is in

breach of the License Agreement. Sears Canada's claims of breach are meritless and

represent a baseless attempt to avoid its obligation to pay in full the royalties due and

owing under the License Agreement.

7.    In this action, MSO seeks to enforce its contractual rights to its future royalty payments in excess of $3.39 million CAD, its rights to immediate payment by Sears Canada in the amount of $61,224.91 USD, an order that Sears Canada remit to Canadian tax authorities $182,118.14 CAD on MSO's behalf, and interest on the amounts due as of September 28, 2007, costs, and attorneys' fees.

8.    MSO also seeks relief in the form of a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that it has not breached the License Agreement as claimed by Sears Canada, and that Sears Canada is entitled to no relief with respect to its royalty obligations under the License Agreement, or otherwise.

## Parties

9.    Plaintiff MSO is a California corporation, with its principal place of business located at 11 West 42nd Street, 25th Floor, New York, NY, 10036.  MSO is a wholly owned subsidiary of Martha Stewart Living Omnimedia, Inc. ("MSLO"), a Delaware corporation.  MSLO's founder, Martha Stewart, is widely recognized as an authority on quality and style in the area of domestic products and related activities. MSLO specializes in providing consumers with unique lifestyle content and high-quality products through its publishing, merchandising, Internet, and broadcasting businesses.

10.    Defendant Sears Canada is a corporation organized under the laws of Canada, with its principal place of business located at 222 Jarvis Street, Toronto, Ontario, Canada M5B 2B8.  Sears Canada offers a wide variety of products to Canadian retail consumers through department and specialty stores throughout Canada, a comprehensive Internet website, and catalog distribution.

## Jurisdiction and Venue

3

11.     Subject matter jurisdiction lies in this Court pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367. There is diversity between MSO, a California corporation with its principal place of business in New York, and Sears Canada, a corporation organized under the laws of Canada with its principal place of business in Canada. The amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Under Section 24.7 of the License Agreement, the Parties consented to personal jurisdiction in the Courts of New York State and the United States District Court for the Southern District of New York in Manhattan for any action arising out of or relating to the License Agreement.

13.     Venue is proper in this district by agreement of the Parties and pursuant to 28 U.S.C. § 1391(d).

## Factual Background

**The License Agreement**

14.     Under the License Agreement, MSO granted to Sears Canada, subject to the terms and conditions of the License Agreement, the right to utilize (i) the Trademark, (ii) Martha Stewart's name, likeness, voice, and signature, and (iii) MSO's intellectual property rights embodied in designs, concepts, patterns, names, and copyrights of certain products and certain packaging and promotional materials. The Licensed Properties may only be used in connection with products approved by MSO pursuant to the License Agreement (the "Licensed Products"), and Sears Canada's license is restricted to the territory of Canada.

15.     Section 3.1 of the License Agreement states that neither MSO nor any affiliate shall "grant any license to use any trademark relating to or incorporating the

4

'Martha Stewart' name (a 'Martha Stewart Trademark') in connection with the promotion, advertising, distribution and sale of any Exclusive Category Products in the Territory." Exclusive Category Products are found at Schedule 1(b) of the License Agreement. "Territory" is defined in the License Agreement as Canada.

16.     On or about September 1, 2003, Sears Canada launched its line of Martha Stewart Everyday branded products. The launch marked the commencement of the first Agreement Year of the License Agreement. Barring early termination, the License Agreement terminates at the end of the fifth Agreement Year, i.e., on August 31, 2008.

**Sears Canada's Obligation to Pay Royalties and to Indemnify**

17.     Articles IV and V of the License Agreement establish Sears Canada's obligation to pay royalties in consideration for the rights granted to it under the License Agreement. Royalties are calculated as a percentage of sales of Licensed Products by Sears Canada, net any amounts actually refunded to customers based on returns of Licensed Products (such amounts are sometimes referred to herein as the "earned royalties"). The royalty rates for each year are set forth on Schedule 4 of the License Agreement.

18.     Sears Canada must pay MSO accrued royalties within 30 days following the end of each quarter of each Agreement Year. Within that 30 day period, Sears Canada must deliver a certified Quarterly Report to MSO reflecting the sales during such quarter by Product category and SKU, as well as the amount of royalties payable with respect thereto. Section 5.2 requires that, upon delivery of the Quarterly

Report, Sears Canada must also pay MSO the royalties due and owing for that quarter.

These royalty payments must be made by wire transfer to a bank designated by MSO.

19.    Under Section 5.3 of the License Agreement, MSO is guaranteed

to receive a Minimum Royalty Amount for each Agreement Year, which "may give rise

to increases in royalty payments otherwise payable." The Minimum Royalty Amounts

for each year are set forth on Schedule 5.3, as amended. Under Section 5.3 of the

License Agreement,

> the royalty payable in connection with the last Quarter of each
> Agreement Year shall be increased by the amount by which the
> Minimum Royalty Amount for such year exceeds the aggregate of
> the royalties previously paid and then payable with respect to such
> Agreement Year.

Therefore, within 30 days of the end of the last quarter of an Agreement Year, Sears

Canada must pay MSO the sum of (i) the earned royalties accrued in the last quarter of

the Agreement Year, plus (ii) the amount, if any, by which the Minimum Royalty

Amount for such Agreement Year exceeds the aggregate of the earned royalties accrued

during such Agreement Year (the "Shortfall Amount").

20.    The License Agreement specifies a contractual rate of interest in

the event of underpayment. Section 5.4 states:

> In the event any audit reveals that Sears Canada has underpaid
> MSO pursuant to this Agreement, Sears Canada shall promptly pay
> MSO the aggregate difference between what MSO should have
> been paid, and what MSO was paid, plus interest on such amount
> at an annual rate of 8%, compounded semi-annually.

21.    While the License Agreement contemplates penalties for

underpayment of royalties, no provision of the License Agreement authorizes Sears

Canada to withhold any portion of royalty payments due and owing for any reason.

22.    Under Section 17.1 of the License Agreement, Sears Canada is obligated to indemnify MSO in respect of and against any and all "claims, losses, liabilities, expenses (including, without limitation, reasonable attorneys' fees and disbursements)," arising out of any breach of the License Agreement by Sears Canada.

**Sears Canada Withholds Royalties**

23.    August 31, 2007 marked the end of the fourth Agreement Year under the License Agreement.  On September 28, 2007, Sears Canada (i) reported that the earned royalties for the quarter ended August 31, 2007 were $233,072.56 USD and (ii) transmitted a payment of earned royalties to MSO in the amount of $209,765.30 USD, which sum represented 90% of the earned royalty (the remaining 10% was to have been submitted by Sears Canada to the Canadian tax authorities on behalf of MSO).  On that date, a Sears Canada employee informed MSO that "the excess to get to the minimum royalty is currently being processed."

24.    Under the License Agreement, Sears Canada was obligated to pay the amount of $1,821,181.37 CAD on September 28, 2007, in order to satisfy its obligation to pay the Minimum Royalty Amount for the fourth Agreement Year.

25.    Sears Canada indicated that it would not pay the Minimum Royalty Amount or indeed future obligations to pay such amounts.

26.    In this connection, Sears Canada contended that a U.S. retail licensee of MSLO effected a breach of the License Agreement.  Sears Canada has claimed that the licensee sent catalogs advertising, *inter alia*, Martha Stewart branded, Exclusive Category Products to Canadian residents.  Upon information and belief, the

7

Canadian residents who received the catalogs were customers at the licensee's stores located in the U.S.

27.    The U.S. retail licensee was not licensed by MSO or any affiliate to promote, advertise, distribute or sell Exclusive Category Products in connection with a Martha Stewart Trademark in Canada. Neither MSO nor any affiliate approved the catalogs for distribution to Canada prior to their dissemination. These actions by the U.S. retail licensee therefore did not result in a breach of the License Agreement by MSO.

28.    Sears Canada has claimed, without merit, that the conduct of the U.S. retail licensee entitles Sears Canada to relief from its obligations to pay MSO the Minimum Royalty Amounts under the License Agreement. The amounts of Sears Canada's future obligations exceed $3.39 million CAD.

29.    On November 8, 2007, only after this action was commenced, Sears Canada released to MSO $1,731,746.36 USD of the total amount due and owing under the License Agreement, 41 days after it was due. Sears Canada (i) continues to withhold $61,224.91 USD from MSO, (ii) has failed to remit to the Canadian tax authorities on behalf of MSO payment in the amount of $182,118.14 CAD; and (iii) has not withdrawn its frivolous assertions of breach or claimed entitlement to relief from its future royalty obligations.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

30.    Plaintiff reasserts and realleges the allegations contained in paragraphs 1 through 29 above as if fully set forth herein.

31.    Pursuant to the License Agreement, Sears Canada was required to pay MSO $1,821,181.37 CAD, representing the Shortfall Amount for the fourth

Agreement Year, on September 28, 2007. Sears Canada failed and refused to do so. The Minimum Royalty Amount for the fifth Agreement Year is $3,392,821 CAD.

32.     In acknowledgment of its obligation to pay royalties on September 28, 2007, Sears Canada released to MSO $1,731,746.36 USD on November 8, 2007, only after MSO initiated this action.

33.     Sears Canada continues to withhold royalties in the amount of $61,224.91 USD, has not remitted to the Canadian tax authorities on MSO's behalf payment in the amount of $182,118.14 CAD, and has indicated that it will withhold royalties in the future. The failure and refusal to pay MSO (and the Canadian tax authorities on behalf of MSO) amounts due and owing for the fourth Agreement Year on that date constitutes a material breach of the License Agreement. Sears Canada's demand for relief from future royalty payments, which will exceed $3.39 million CAD, also constitutes a material breach of the License Agreement.

34.     MSO has performed its obligations under the License Agreement.

35.     By reason of the foregoing, Sears Canada is liable to MSO both for the anticipatory breach of future obligations and present obligations to pay royalties. MSO is entitled to recover damages in an amount to be determined at trial, but in no event less than $3,392,821, together with $61,224.91 USD, plus $182,118.14 CAD which should be remitted on MSO's behalf to the Canadian tax authorities, plus contractually-specified interest on all amounts due as of September 28, 2007. MSO is also entitled to indemnification, including attorney's fees.

9

## SECOND CLAIM FOR RELIEF
### (For Declaratory Judgment)

36.    Plaintiff reasserts and realleges the allegations contained in paragraphs 1 through 35 above as if fully set forth herein.

37    MSO has honored its obligations to Sears Canada under the terms of the License Agreement with respect to the use of Martha Stewart Trademarks in Canada.  Neither MSO nor any affiliate has licensed any third party to use a Martha Stewart Trademark in connection with the promotion, advertising, distribution and sale of Exclusive Category Products in Canada.

38.    Nevertheless, Sears Canada contends that a U.S. retail licensee of MSLO has effected a breach of Sears Canada's License Agreement with MSO by sending catalogs advertising, *inter alia*, Martha Stewart branded, Exclusive Category Products to the licensee's customers who live in Canada, but who have shopped at the licensee's stores located in the U.S.

39.    Sears Canada contends that the licensee's sending of such catalogs violates Sears Canada's rights under the License Agreement.  Sears Canada further contends that this purported breach entitles it to relief with respect to its obligation to pay the Minimum Royalty Amounts required by the License Agreement now and in the future.

40.    As a result, Sears Canada withheld $1,821,181.37 CAD, which Sears Canada was required to pay on September 28, 2007 and indicated that it would require relief from subsequent royalty payments, which will exceed $3.39 million CAD. On November 8, 2007, Sears Canada released $1,731,746.36 USD of the withheld royalty amounts to MSO.  Sears Canada continues to withhold $260,443.94 USD in

10

royalties presently due and owing under the License Agreement, $61,224.91 USD of which should be remitted to MSO and $182,118.14 CAD of which should be remitted to the Canadian tax authorities on MSO's behalf.

41.    Sears Canada's contentions of breach and demands for relief are meritless and baseless. Neither MSO nor any affiliate has committed or effected any breach of the License Agreement.

42.    Neither MSO nor any affiliate has sanctioned the U.S. retail licensee's distribution of catalogs containing Martha Stewart branded, Exclusive Category Products to Canada. The licensee is not licensed to engage in such conduct, and neither MSO nor any affiliate approved the catalogs prior to their dissemination to Canada.

43.    By virtue of the foregoing, an actual controversy exists between MSO and Sears Canada.

44.    MSO is entitled to a judgment declaring that it is not in breach of the License Agreement by reason of its U.S. retail licensee's unauthorized distribution of catalogs advertising Martha Stewart branded, Exclusive Category Products, and that Sears Canada is not entitled to relief from its present and future royalty obligations, or otherwise.

### Jury Demand

Plaintiff hereby demands a trial by jury.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests the entry of Judgment against Defendant as follows:

11

(a)    Awarding MSO damages in an amount to be determined at trial but no less than $3,392,821 CAD plus $61,224.91 USD;

(b)    Ordering Defendant to remit $182,118.14 CAD to the Canadian tax authorities on MSO's behalf in connection with the $1,821,181.37 CAD royalties owed MSO;

(c)    Awarding MSO interest on amounts due as of September 28, 2007 at the contractually-specified rate;

(d)    Awarding MSO the costs and expenses, including attorneys' fees, incurring in prosecuting this action;

(e)    Awarding MSO declaratory relief that the conduct by the U.S. retail licensee does not effect a breach of the License Agreement by MSO, and does not entitle Sears Canada to relief with respect to its royalty obligations, or otherwise; and

(f)    Awarding other and further relief as the Court deems necessary and proper.

Dated: New York, New York
       November 9, 2007

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
          Leslie Gordon Fagen

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Attorneys for Plaintiff MSO IP Holdings, Inc.

12

## LICENSE AGREEMENT

THIS AGREEMENT made as of this 27th day of April, 2002 (this "Agreement"), by and between MSO IP HOLDINGS, INC., a California corporation, with its principal place of business at 11100 Santa Monica Boulevard, Suite 600, Los Angeles, California 90025 ("MSO") and SEARS CANADA INC., a corporation organized under the laws of Canada, with its registered office at 222 Jarvis Street, Toronto, Ontario, Canada M5B 2B8 ("Sears Canada")(each of MSO and Sears Canada, a "Party").

WHEREAS, MSO is a wholly-owned subsidiary of Martha Stewart Living Omnimedia, Inc., a Delaware corporation ("MSLO");

WHEREAS, MSO and Sears Canada desire to enter into an agreement whereby MSO will grant to Sears Canada, subject to the terms and conditions herein, the right to utilize Martha Stewart's name, likeness, voice and signature in connection with the design, sourcing, distribution, promotion and sale of retail merchandise hereinafter described;

NOW, THEREFORE, for good and valuable consideration the sufficiency of which is hereby acknowledged by the Parties, the Parties hereby agree as follows:

### Article I.    Definitions

"Affiliates" shall mean, with respect to any person or entity, any other person or entity which, directly or indirectly, controls or is controlled by or is under common control with such person or entity and for the purposes of this definition, "control" with respect to any company includes the power to direct the management and policies of such company, directly or indirectly, through the ownership of a majority of voting securities and the terms "controlling" and "controlled" shall be construed accordingly. For the avoidance of doubt, MSO's Affiliates shall always include MSLO and Sears Canada's Affiliates shall always include Sears Canada Merchandising Services.

"Agreement" shall have the meaning set forth in the preamble hereof.

"Agreement Year" shall mean each successive twelve-month period commencing on the Launch Date.

"Annual MSE Advertising Spend" shall have the meaning set forth in Section 8.1 hereof.

"Application Sheet" shall mean the application letter and/or the form thereof shown in Schedule 1(a) hereto to be used for the application for MSO's approval in accordance with Article VII hereof.

"Claims" shall have the meaning set forth in Section 17.1 hereof.

"Covered Facility" shall have the meaning set forth in Section 7.3 hereof.

1

"Covered Products" shall have the meaning set forth in Section 7.3 hereof.

"Covered Vendor" shall have the meaning set forth in Section 7.3 hereof.

"Direct Commerce" shall mean the Internet, catalogs or other forms of commerce that do not require consumers to leave their homes to make a purchase.

"Discussion Period" shall have the meaning set forth in Section 3.2 hereof.

"Exclusive Category Products" shall mean merchandise in the merchandise categories set forth on Schedule 1(b) hereto.

"Final Terms" shall have the meaning set forth in Section 3.2 hereof.

"First Right" shall have the meaning set forth in Section 3.2 hereof.

"Information" shall have the meaning set forth in Article XXIV hereof.

"Insurance" shall have the meaning set forth in Article XVIII hereof.

"Kmart" shall mean Kmart Corporation, a corporation organized under the laws of the State of Michigan, U.S.A.

"Kmart Agreement" shall mean the agreement, dated as of June 21, 2001, between MSO and Kmart, as well as any predecessor agreements between MSLO and Kmart.

"Kmart Materials" shall mean all advertising, promotional, marketing, point-of-sale, packaging and similar materials initially created and used in connection with the Kmart Products.

"Kmart Products" shall mean products which (i) are, or have been, sold in the United States pursuant to (a) the Kmart Agreement, or (b) if MSO elects, any other agreement governing a merchandising program that utilizes a Martha Stewart Trademark, and (ii) are Exclusive Category Products.

"Launch" shall mean the commencement of the sale of Licensed Products at Sears Canada Stores.

"Launch Date" shall mean the first day of the calendar quarter in which the Launch occurs, but shall not be later than July 1, 2003.

"Launch Services" shall have the meaning set forth in Section 12.2 hereof.

"Licensed Materials" shall mean all advertising, promotional, marketing, point-of-sale, packaging and similar materials relating to the Licensed Products and approved by MSO pursuant to Article VIII hereof or used by Sears Canada in connection with the Licensed Products.

2

"Licensed Products" shall mean those products that have been approved by MSO for distribution by Sears Canada pursuant to Article VII hereof.

"Licensed Program" shall mean the merchandising program specific to the Licensed Properties and conducted by Sears Canada pursuant to the terms of this Agreement.

"Licensed Properties" shall mean collectively the Trademarks, the MSO Materials Elements, the MSO Product Elements and the Stewart Rights.

"Local Laws" shall have the meaning set forth in Section 7.3 hereof.

"Martha Stewart Store" shall have the meaning set forth in Section 3.1 hereof.

"Martha Stewart Trademark" shall have the meaning set forth in Section 3.1 hereof.

"Materials Files" shall mean electronic files that contain photographs of, and other relevant design and textual components of, particular advertising, promotional, marketing, packaging and point of sales materials relating to the Kmart Products.

"Meeting Report" shall have the meaning set forth in Section 6.4 hereof.

"Minimum Royalty Amounts" shall have the meaning set forth in Section 5.3 hereof.

"MSE Branded Print Materials" shall have the meaning set forth in Article IX hereof.

"MSLO" shall have the meaning set forth in the preamble hereof.

"MSO" shall have the meaning set forth in the preamble hereof.

"MSO Claim" shall have the meaning set forth in Section 17.2 hereof.

"MSO Materials" shall mean all Kmart Materials and all Licensed Materials.

"MSO Materials Elements" shall mean all of MSO's and MSLO's rights in the intellectual property elements embodied in the MSO Materials, including, without limitation, all designs, concepts, patterns, names and copyright rights.

"MSO Product Elements" shall mean all of MSO's and MSLO's rights in the intellectual property elements embodied in the Kmart Products and the Licensed Products, including, without limitation, all designs, concepts, patterns, names and copyright rights.

"New Category Expansion" shall have the meaning set forth in Section 3.2.

"New Category Products" shall mean merchandise in the merchandise categories set forth on Schedule 1(c) hereof.

"New Terms" shall have the meaning set forth in Section 3.2 hereof.

"Party" shall have the meaning set forth in the preamble hereof.

"Proceedings" shall have the meaning set forth in Section 24.7 hereof.

"Product Files" shall mean electronic files that contain photographs of, and relevant design and manufacturing specifications for, a particular product.

"Projections" shall have the meaning set forth in Article XIX hereof.

"Quarter" shall mean each calendar quarter during the Term commencing on the Launch Date.

"Quarterly Reports" shall have the meaning set forth in Section 5.1 hereof.

"Representatives" shall have the meaning set forth in Article XXIV.

"Retail Season" shall have the meaning set forth in Section 8.1 hereof.

"Sales" for a particular period shall mean the aggregate retail sale prices charged by Sears Canada for Licensed Products sold during such period, net any amounts actually refunded by Sears Canada to customers on account of returns of Licensed Products during such period.

"Sears Canada" shall have the meaning set forth in the preamble herein.

"Sears Canada Catalog" shall mean the "Sears" branded catalog distributed by Sears Canada in the Territory.

"Sears Canada Claim" shall have the meaning set forth in Section 17.1 hereof.

"Sears Canada Stores" shall mean "Sears" branded retail stores owned or operated by Sears Canada.

"Sears Canada Website" shall mean the "Sears" branded e-commerce internet site operated by Sears Canada.

"Semi-Annual Meetings" shall have the meaning set forth in Section 6.1 hereof.

"Stewart Rights" shall mean MSO's right to utilize the name, likeness, voice and signature of Martha Stewart, in each case solely in connection with the exploitation of the Trademarks as permitted herein.

"Term" shall have the meaning set forth in Article XIV.

"Territory" shall mean Canada.

"Trademarks" shall mean MARTHA STEWART EVERYDAY™ and variations and stylized forms thereof designated in writing by MSO.

4

"Vendor Agreement" shall have the meaning set forth in Section 7.2 hereof.

## Article II.    License Grant; Responsibilities

2.1  Subject to the terms and conditions of this Agreement, MSO licenses to Sears Canada during the Term the limited right to utilize the Licensed Properties in the Territory solely in connection with (i) the design of merchandise and related advertising, promotional, marketing, packaging, point-of-sale and similar materials pursuant to the terms of this Agreement, (ii) the sourcing of Licensed Products and Licensed Materials by Sears Canada, (iii) the sale of Licensed Products by Sears Canada through Sears Canada Stores in the Territory and through the Sears Canada Catalog and Sears Canada Website, and (iv) the exploitation of Licensed Materials solely in the Territory and solely in connection with the advertising, promotion and marketing of Licensed Products as permitted hereby. Any sale or other exploitation of the Licensed Products or Licensed Materials or use of the Licensed Properties in a manner not explicitly permitted hereunder shall be deemed a material breach of this Agreement. Sears Canada will not actively distribute or promote outside the Territory Sears Canada Catalogs featuring the Licensed Products and will not actively promote the Sears Canada Website outside the Territory, and Sears Canada and MSO agree to work together cooperatively following execution of this Agreement to limit the sales of Licensed Products outside the Territory via the Sears Canada Catalog and Sears Canada Website. MSO will not grant to any third party the right to actively target the Territory for sales of Exclusive Category Products in connection with the Trademark, it being understood that Direct Commerce sales of such products could nonetheless occur in the Territory.

2.2  Subject to MSO's rights of approval hereunder, Sears Canada shall be responsible for (i) obtaining approval for all products to be sold hereunder and all related advertising, promotional, marketing, packaging and point-of-sale materials, (ii) translating Licensed Materials into French as required by applicable law and adequately providing such translated Licensed Materials where required, (iii) sourcing all Licensed Products and Licensed Materials, (iv) distributing and selling all Licensed Products as permitted hereunder, (v) advertising and promoting the Licensed Products, and (v) providing all service and support for the Licensed Products in a manner at least consistent with the service and support Sears Canada provides in connection with its other merchandise.

## Article III.    Exclusivity: First Right

3.1  MSO agrees that it shall not, and shall cause each of its Affiliates not to, grant any license to use any trademark relating to or incorporating the "Martha Stewart" name (a "Martha Stewart Trademark") in connection with the promotion, advertising, distribution and sale of any Exclusive Category Products in the Territory. Notwithstanding anything herein to the contrary, (i) overflow of television and radio advertisements into the Territory via United States television and radio broadcasts or cable/satellite casts, as well as access to any Internet content by persons in the Territory, in either case referencing a Martha Stewart Trademark in connection with an Exclusive Category Product, shall not constitute a breach of this Agreement, (ii) bedding and related products (e.g. draperies) utilizing the trademarks "Martha Stewart Signature" or "Martha by Mail" (or any successor Martha Stewart Trademark used in connection with those programs provided such marks are readily differentiable from the Trademark) may be sold in the Territory solely as a complement to the sale of MSO furniture products, provided that any such bedding or

related products are of a substantially higher end/quality than similar products offered by Sears Canada in connection with the Trademark, and (iii) MSO and its Affiliates shall be permitted to promote, advertise, distribute and sell Exclusive Category Products in the Territory in connection with Martha Stewart Trademarks (1) through their respective Direct Commerce businesses, and (2) through a "Martha Stewart" branded store, or a store primarily devoted to selling "Martha Stewart" branded products (a "Martha Stewart Store"), provided that (a) before opening any Martha Stewart Store in the Territory, MSO agrees to discuss such an opening with Sears Canada and to investigate the possibility of opening and operating such store or stores (I) in cooperation with Sears Canada or, (II) in such a manner as to limit interference with, and instead enhance, the business contemplated by this Agreement, (b) no Martha Stewart Store will be opened in the Territory prior to the midpoint of the third Agreement Year, and (c) no more than five Martha Stewart Stores will be opened in the Territory.

3.2    In the event MSO or its Affiliates wish to sell any New Category Products utilizing a Martha Stewart Trademark in the Territory, MSO agrees that it shall (i) approach Sears Canada with any plans it generates for such proposed New Category Products in the Territory during the Term (a "New Category Expansion") prior to negotiating with any third party regarding such plans, and (ii) discuss the possibility of pursuing such New Category Expansion exclusively with Sears Canada for a period of thirty (30) days (the "Discussion Period"), provided that the Discussion Period may be terminated earlier if it is mutually agreed upon by MSO and Sears Canada that there is no reasonable likelihood to agree on terms for the cooperative pursuit of such New Category Expansion. If, however, MSO and/or its affiliates are approached by a third party without invitation or solicitation, MSO and/or its Affiliates may conduct initial discussions, but not negotiations, with such party to the extent sufficient to understand the nature and scope of the potential opportunity with such third party, but must then engage in the Discussion Period as outlined above. In the event no agreement can be reached between the Parties on the material terms pursuant to which the Parties would cooperatively undertake a New Category Expansion prior to the end of the Discussion Period, (A) Sears Canada shall, promptly following the end of the Discussion Period, deliver to MSO a certificate accurately stating the final material terms pursuant to which Sears Canada was willing to undertake the New Category Expansion with MSO (the "Final Terms"), and (B) MSO shall be free to pursue such New Category Expansion either on its own or with any third party, provided that, if MSO pursues such New Category Expansion with a third party, the terms under which it pursues such New Category Expansion (the "New Terms") shall, when taken as a whole, be more favorable to MSO than the Final Terms. The obligations described in this Section 3.2 are hereby referred to as a "First Right."

3.3    In the event that MSO and Sears Canada mutually agree to pursue a New Category Expansion, then MSO and Sears Canada shall either enter into a new definitive transaction agreement with respect to such New Category Expansion or execute an addendum or amendment to this Agreement to incorporate the New Category Expansion herein; provided, that no contract or agreement providing for such New Category Expansion shall be deemed to exist unless and until a definitive transaction agreement or an addendum or amendment to this Agreement shall have been executed and delivered by MSO and Sears Canada with respect thereto.

3.4    Notwithstanding anything to the contrary contained herein, MSO shall not be subject to a First Right regarding any discussions or negotiations with a third party relating in

6

whole or in part to a New Category Expansion if MSO reasonably believes at such time that the majority of the revenues it would derive from the transaction or relationship it is pursuing in such discussions would relate to sales of products outside of the Territory. In the event that, prior to entering into a relationship or transaction, it is no longer reasonable for MSO to believe that the majority of the revenues it would derive from the transaction or relationship it is pursuing in such discussions would relate to sales of products outside of the Territory, the First Right shall again apply.

3.5     Notwithstanding the licenses and exclusive categories provided for herein, MSO is under no obligation to grant Sears Canada the right to utilize any of the Licensed Properties except as approved pursuant to Articles VII and VIII hereof.

## Article IV.     Royalties

4.1     In consideration for the rights licensed to Sears Canada by MSO and for the services to be rendered by MSO under this Agreement, Sears Canada shall pay to MSO in the manner described in Article V below royalties based on Sales at the royalty rates set forth on Schedule IV.

## Article V.     Payments

5.1     Sears Canada shall deliver royalty reports to MSO within thirty (30) days following the end of each Quarter (the "Quarterly Reports"). Each Quarterly Report shall be certified as accurate by an authorized Sears Canada officer and shall set forth the Sales during such quarter by Product category and SKU, as well as the amount of royalties payable with respect thereto. In addition to the Quarterly Reports, Sears Canada shall deliver non-binding (but based on Sears Canada's then current knowledge) interim reports containing the same sales information on a monthly basis. Additionally, Sears Canada shall work to provide MSO with electronic access to current financial information relating to Sales via any systems necessary to provide MSO such access.

5.2     When Sears Canada delivers the Quarterly Reports to MSO, Sears Canada shall also pay to MSO the royalties due and owing for the corresponding quarter. These payments shall be made by wire transfer to a bank account designated by MSO.

5.3     Schedule 5.3 hereto sets forth certain guaranteed royalty amounts with respect to each Agreement Year ("Minimum Royalty Amounts") which may give rise to increases in royalty payments otherwise payable. Specifically, the royalty payable in connection with the last Quarter of each Agreement Year shall be increased by the amount by which the Minimum Royalty Amount for such year exceeds the aggregate of the royalties previously paid and then payable with respect to such Agreement Year.

5.4     Sears Canada shall maintain complete and accurate records of the Sales, royalty computations, royalty reports and amounts spent on advertising and shall, upon reasonable request, make such records and all other documents and materials in the possession or control of Sears Canada and reasonably required to confirm Sears Canada's satisfaction of its obligations under this Agreement available to MSO or its duly authorized representatives, during usual business hours at Sears Canada Headquarters in Toronto, Ontario, for the duration of this

7

Agreement and for one year thereafter, and to make extracts therefrom at its sole expense. All such records and documents shall be deemed Information under Section 22.5 hereof. In the event any audit reveals that Sears Canada has underpaid MSO pursuant to this Agreement, Sears Canada shall promptly pay MSO the aggregate difference between what MSO should have been paid, and what MSO was paid, plus interest on such amount at an annual rate of 8%, compounded semi-annually. In the event of any overpayment by Sears Canada, the amount of such overpayments (net of MSO's audit expenses), plus 8% interest on such amount, accruing from the time of such overpayment, compounded semi-annually, shall be credited against any amounts otherwise owed to MSO by Sears Canada or future payments by Sears Canada to MSO or, if no such payments are expected to become payable, shall be refunded to Sears Canada by MSO. Moreover, in the event the amount of any such underpayment equals or exceeds two and one-half percent (2.5%) of the amounts actually paid to MSO during the period with respect to which the audit was conducted, Sears Canada shall bear MSO's reasonable costs of the audit, including, without limitation, any amounts payable to MSO's outside auditors in connection therewith.

## Article VI.    Strategic Direction; Semi-Annual Meetings

6.1    Approximately every six (6) months during the Term, representatives of MSO and Sears Canada shall meet (the "Semi-Annual Meetings") in order to discuss strategic issues regarding the relationship created by this Agreement, including, without limitation, directional issues relating to product assortment, financial performance, and product design and quality. Unless mutually agreed otherwise, these meetings will alternate between New York and Toronto.

6.2    Two weeks prior to each Semi-Annual Meeting, Sears Canada shall provide MSO (i) historical data of sales performance by product category and SKU, (ii) Sears Canada's proposed assortment strategy for the Licensed Program to be sold in the Territory during the twelve-month period commencing twelve-months from the Semi-Annual Meeting, including detail with respect to SKUs by category, (iii) a sales forecast reflecting Sears Canada's proposed assortment strategy for the Licensed Program, and (iv) any other relevant information that will facilitate the Semi-Annual Meeting. MSO and Sears Canada shall work together to develop a cost-effective and simple process by which MSO can provide Sears Canada with timely access to information relating to any newly developed and approved Kmart Products so that Sears Canada may incorporate such products into its planning for forthcoming assortment strategies.

6.3    At each Semi-Annual Meeting, Sears Canada and MSO shall discuss the financial performance, the financial forecast and the proposed assortment strategy for the Licensed Program and shall work diligently to approve an assortment strategy for the twelve-month period commencing twelve months from the Semi-Annual Meeting. Unless MSO agrees otherwise, the substantial majority of the products comprising each assortment of Licensed Products will be Kmart Products. Among the criteria that MSO will use in determining whether to approve products other than Kmart Products for inclusion in an assortment (as opposed to the criteria MSO will utilize in connection with the approval of a specific product design or sample under Article VII) will be (i) whether such products would fill in agreed upon gaps in an existing assortment, (ii) whether such products are particularly well-suited to the Canadian marketplace, (iii) whether the development of such products and their inclusion as Licensed Products would be economically desirable for MSO, (iv) whether the inclusion of such products would be consistent with the goodwill and reputation of the Trademark, and (v) if such products are in new

8

categories or price points, whether such categories or price points are consistent with MSO's brand and merchandising strategy. In no event will MSO be required to approve any products that are not Exclusive Category Products.

6.4    Promptly following each Semi-Annual Meeting, Sears Canada shall prepare a report of the outcome of the meeting (the "Meeting Report"), which shall set forth the material items discussed and agreed upon at the Semi-Annual Meeting. MSO shall thereafter either acknowledge the accuracy of and sign the Meeting Report or propose revisions. This process shall continue until both Parties execute a Meeting Report. Each Party shall work diligently and in good faith to finalize each Meeting Report as expeditiously as possible, and that Meeting Report shall then be determinative with respect to the matters covered thereby unless the Parties mutually agree otherwise.

Article VII.  Product Approvals; Vendors; Labor Compliance

7.1    Prior to any product being sold as a Licensed Product hereunder, it must be approved by MSO pursuant to the process outlined herein. The process for development and approval of potential Licensed Products shall generally be conducted by the Parties as follows:

(i) Sears Canada shall send to MSO an Application Sheet relating to a product with respect to which approval is being sought that accurately and fully reflects the required information on the Application Sheet, including product specifications, product designs, and proposed vendor, along with accompanying physical samples that represent certain materials, designs or other relevant materials intended to provide MSO with an understanding of the potential product (e.g., if a particular porcelain quality is intended for a product, a sample of such porcelain would accompany the Application Sheet). Sears Canada shall use commercially reasonable efforts to avoid proposing products for approval in heavy concentrations or at such a point in the development timeline that there is not reasonable time for comment by MSO and subsequent revision by Sears Canada . The Parties shall work together to communicate schedules for such approvals to avoid unnecessary burdens and delays in the process. No Application Sheets shall be delivered to MSO relating to products that are not part of an approved assortment strategy for Licensed Products.

(ii) MSO shall reasonably determine whether to approve Sears Canada's application and shall issue its response by facsimile or e-mail promptly following MSO's receipt of the Application Sheet, or shall contact the relevant contact person at Sears Canada to discuss the same. It may be necessary that the same product receive several sets of approvals, as a first Application Sheet may not contain all required information (e.g. a first Application Sheet may simply lay out a product's specifications which, once approved as set forth above, would then need to be designed and a vendor would need to be selected, in which case the design and vendor would again be subject to the same approval process).

(iii) Following final approval of all Application Sheets relating to a particular product, Sears Canada will have a sample of such product manufactured and delivered to MSO for approval. If MSO does not approve such sample and requests revisions, this process shall continue until MSO approves the sample.

Only after all of the foregoing approvals have been received with respect to a proposed product will it become a Licensed Product approved for sale hereunder. Notwithstanding the foregoing, Kmart Products that are consistent with an approved Licensed Product assortment shall not be subject to the foregoing process so long as such products are not to be modified in any manner, and Sears Canada need only notify MSO of its intent to offer such products within such approved assortment. MSO and Sears Canada shall agree on the mechanics of such notification following execution of this Agreement. MSO may then object to such product if it reasonably feels that such product would be problematic for the Canadian market or if problems have arisen with such product in the United States. However, if Sears Canada wishes to have any such Kmart Products manufactured by a vendor other than the vendor currently manufacturing such product for Kmart, then Sears Canada shall comply with Section 7.1(iii) above.

7.2     Sears Canada shall have the right to select third-party vendors for Licensed Products, Licensed Materials and related creative services, provided that (i) all Licensed Products and Licensed Materials produced by such vendors conform in specification and quality to approved samples of such Licensed Products and Licensed Materials, (ii) MSO shall have the right to pre-approve any vendor of Licensed Materials or provider of material creative services, and (iii) prior to any vendor receiving any designs or other proprietary or confidential information, manufacturing any Licensed Products or Licensed Materials, or providing any material creative services, such vendor must enter into an agreement (the "Vendor Agreement") in substantially the form set forth on Schedule 7.2 hereto (with such modifications as particular situations may require) regarding the confidential and proprietary nature of certain information, designs and materials to which the vendors shall have access or develop. MSO and Sears Canada shall cooperate to cause all such vendors to enter into the Vendor Agreement.

7.3     Sears Canada and MSO each agree that ensuring that the Licensed Products are manufactured in compliance with all applicable human rights, labor and wage laws are an important objective of the Parties and this Agreement. In furtherance of the foregoing, Sears Canada shall, and shall cause its Affiliates to, do the following: (i) disclose to MSO the identity of suppliers of any Licensed Product or any component thereof that is uniquely and readily associated with one or more Licensed Products and/or the "Martha Stewart" name (collectively, the "Covered Products") (each such supplier, a "Covered Vendor") and the locations of facilities where Covered Products are manufactured by a Covered Vendor (each such facility, a "Covered Facility"); (ii) require as a condition to its purchases of Covered Products that each Covered Vendor comply with all applicable laws relating to human rights, wage and labor practices ("Local Laws") in the jurisdictions where such Covered Vendor manufactures Covered Products; and (iii) take commercially reasonable steps to monitor, either itself or through a reputable, independent agent that is generally engaged in the business of monitoring compliance with Local Laws, such Covered Vendor's compliance with Local Laws, and (iv) require any Covered Vendors found to not be in compliance with Local Laws to take such reasonable corrective actions as are necessary to return such Covered Facility to compliance, or to move production of the Covered Products to a compliant facility. MSO will be provided access by Sears Canada to any reports or information relating to such Covered Vendor's compliance with Local Laws, and employees or representatives of MSO may accompany Sears Canada or its representatives on any site visits at MSO's expense.

## Article VIII.  Advertising

10

8.1     The Parties shall meet during the second calendar quarter of each year of the Term to agree upon an advertising and media strategy for the twelve-month period beginning on the following February 1 (a "Retail Season"). Two weeks prior to such meeting, Sears Canada shall provide MSO with its proposed media plan that describes all promotional activity planned for the Licensed Products in the Territory for such period, including detail of how Sears Canada would like advertising funds to be allocated across media, and the effective reach in terms of number of impressions for each material component of its plan. At the meeting, MSO and Sears Canada shall discuss Sears Canada's proposed media plan, including the aggregate amount to be spent on promoting Sales and the allocation of such amounts amongst various media, and shall work diligently to agree on the same. If the Parties are unable to agree, Sears Canada's determinations regarding the media plan shall be controlling, provided that the aggregate amount to be spent on advertising for the Licensed Products during a given Agreement Year (the "Annual MSE Advertising Spend") shall be no less than 6% of the Projections with respect to each such Agreement Year.  These funds shall include amounts spent on television, print, billboard and radio advertising and catalog, event marketing, and shall include amounts spent on creative services to create the underlying Licensed Materials. Notwithstanding the foregoing, in the event Sales for a particular Agreement Year are less than the Projections for such year, the minimum amount that may constitute the Annual MSE Advertising Spend for the following Agreement Year shall be reduced by the amount derived by multiplying (a) 0.06, and (b) the excess of the Projections for the prior Agreement Year over the Sales for such Agreement Year. Sears Canada represents and warrants that in any given year the Annual MSE Advertising Spend shall, as a percentage of Sales, exceed the percentage that the aggregate amount of comparable spending by Sears Canada on all its products that are Exclusive Category Products represent of total sales of such products.

8.2     The final media plan for a given Retail Season shall be provided to MSO in written form.  Periodically throughout the Retail Season, MSO shall be kept apprised of the media activities relating to the Licensed Products.  Additionally, midway through each Retail Season the parties shall meet to review the performance of the media plan and make any desired modifications. Sears Canada shall share with MSO all consumer research it collects relating to the Licensed Products and the "Martha Stewart Everyday" brand.

## Article IX. Materials Approvals; Creative Services

9.1     MSO shall have the right to approve all advertising, promotional, packaging, point of sale and similar materials, including catalog and internet layouts, relating to the Licensed Products prior to their exploitation. MSO and Sears Canada agree to work out an efficient process for obtaining such approvals that minimizes the burdens on each Party, in a manner similar to that outlined in Article 7 hereof.  In furtherance of the foregoing, the Parties agree as follows:

(i)     Packaging and Signage. Sears Canada shall, whenever possible, utilize pre-existing creative assets from Kmart Materials (including packaging design templates, copy and photography) in packaging and signage for the Licensed Products.

(ii)     Television, Radio and Print Advertising.

11

(a) <u>Television and Radio</u>. When Sears Canada and MSO desire to use dedicated brand television or radio advertising to promote Sales in the Territory, Sears Canada shall utilize television or radio advertising materials, as the case may be, that are Kmart Materials. When mention or reference of the Licensed Products or the Trademark is to be made in any television or radio advertising which is not dedicated to promotion of the Licensed Products, MSO shall have approval rights over the manner in which the Trademark and the Licensed Products are referenced and included and over the finished advertising material and, with respect to any such television advertising, the right to send a member of its creative team to assist in the shoot for such advertisement.

(b) <u>Print, Catalog and Internet</u>. With respect to dedicated brand print advertisements (e.g. magazines or outdoor advertising), Sears Canada shall utilize branded print advertisement materials that are Kmart Materials (the "<u>MSE Branded Print Materials</u>"). With respect to all other print advertisements, including advertising circulars, catalog, and internet (including product shots), Sears Canada shall utilize MSE Branded Print Materials wherever practicable, however, where Sears Canada deems it necessary to take original photography and create original layouts it may do so, subject to MSO's approval. Notwithstanding the foregoing, with respect to any "room" or "environment" photographs (as opposed to "silhouette" photographs), or any dedicated catalogs, or catalogs in which a substantial portion of the layouts will be dedicated to Licensed Products, MSO shall have adequate notice to enable it to provide one creative services representative to collaborate with Sears Canada on the creative aspects of such print advertisement, catalog materials or internet layouts.

To facilitate the foregoing, MSO and Sears Canada shall develop a process pursuant to which MSO can provide Materials Files to Sears Canada in an appropriate and efficient fashion.

9.2   While MSO has the right to approve all advertising, promotional, packaging, point of sale and similar materials, including catalog and internet layouts, relating to the Licensed Products prior to their being deemed Licensed Materials permitted to be utilized hereunder, MSO and Sears will work together to develop a system of spot checking materials by category to provide MSO comfort with respect to brand consistency without requiring MSO to approve each particular item to be utilized hereunder. A component of this system shall include the development by MSO of brand guidelines that it will provide to Sears Canada and that Sears Canada will endeavor to follow in the development of all packaging, advertising, promotional, marketing, point-of-sale and similar materials and all product designs. It is the expectation of the Parties that MSO's exercise of this right of approval will be more frequent in the early part of the Term, and will diminish as the Parties develop a better understanding of their respective expectations.

9.3   Notwithstanding Section 9.2, when Sears Canada intends to develop dedicated brand television, radio or print advertising, and Sears Canada intends to materially alter, amend or edit the Kmart Materials on which such advertising will be based, Sears Canada shall involve MSO

as early in the process as practicable and inform MSO of its intentions. MSO and Sears Canada shall then work together to provide for any such alterations, amendments or edits that are approved by MSO in a mutually agreeable fashion, including, with respect to dedicated television advertisements, by allowing any re-editing to be done by MSO's advertising agency to avoid the need for costly re-edits to satisfy MSO's brand concerns.

## Article X. Approvals; Specifications; Timing

10.1    Sears Canada agrees that each Product and Material shall conform to the specifications and quality standards approved by MSO pursuant to Articles VII and IX hereof. Upon receipt of a notice in writing from MSO pursuant to this Agreement setting forth any quality deficiencies or any variances from approved specifications, or upon Sears Canada's discovery of any such deficiencies or variances, Sears Canada shall, or shall cause the vendors of the Licensed Products or Licensed Materials containing such deficiencies or variances to, remedy such deficiencies or variances prior to the sale of such Licensed Products or exploitation of such Licensed Materials or, at their option, dispose of such merchandise through other outlets. Whenever such merchandise is sold as aforesaid, Sears Canada shall ensure that no use of or reference to the Trademark or exploitation of the Stewart Rights shall be used in connection with any advertising, publicity, labeling, wrapping or packaging with respect to any such sales. MSO shall be paid full royalties on any amounts received by Sears Canada in connection with any such disposition.

10.2    The Parties acknowledge that the processes described in this Agreement must be cooperative and that all details of these processes have not yet been fully delineated and may require change by mutual agreement. Accordingly, each Party agrees that they will work in good faith to ensure that these processes occur as efficiently and harmoniously as possible. Each Party will designate certain individuals with the authority to exercise such Party's right of approval with respect to a particular matter requiring such Party's approval, provided that the identity of such individuals may differ with respect to particular matters (e.g., a Party may have an individual responsible for approving product design and a different individual responsible for approving Licensed Materials). MSO and Sears Canada agree to exercise their rights of approval reasonably promptly and in a spirit of partnership and cooperation, it being acknowledged that any decision made by either Party based on concerns about its brands or reputation shall not be deemed unreasonable if made in good faith.

## Article XI. In-Store Presentation

11.1    Sears Canada shall sell Licensed Products only through the Martha Stewart Everyday "store-in-store" format, including, but not limited to, the fixturing, signage, and layouts of such "store-in-stores." Unless there are compelling business reasons dictating otherwise and approved by MSO, Licensed Products shall be sold in dedicated, full-run shelf-space. Merchandise that competes with Licensed Products shall not be commingled with Licensed Products in Sears Canada Stores or otherwise sold in connection with Licensed Materials, provided that, with respect to certain pre-approved product categories in which the Licensed Products do not constitute a significant assortment, Sears Canada may sell such Licensed Products with other products so long as they are not sold in connection with any Licensed Materials or otherwise in a fashion that may give rise to confusion regarding whether such products are Licensed Products. The "store-in-store" format employed by Sears Canada

13

shall be developed with the assistance of MSO and shall be subject to MSO's reasonable approval.

## Article XII.    Launch Services

12.1    The Parties acknowledge that the Launch Services shall be of a substantially different nature, scope and intensity from those services to be rendered by MSO following the Launch, and that the royalty provided for hereunder is intended to compensate MSO for the ongoing services it renders following the Launch Date and for the licenses granted hereunder, and not for the Launch Services. Accordingly, Sears Canada agrees, subject to the appropriate rendition of the Launch Services by MSO, to pay MSO a fee for its provision of the Launch Services equal to  $400,000 U.S., payable in four equal installments on each of the date of the execution of this Agreement, July 1, 2002, October 1, 2002 and January 1, 2003. Such payments shall be made in accordance with the payment provisions of Article V.

12.2    The "Launch Services" shall mean all services rendered by personnel of MSO and its Affiliates in connection with the launch of Licensed Products at the Sears Canada Stores, including (i) the approval and development of all product assortments, products, advertising plans and materials, and packaging, (ii) the creation and transferring of Materials Files and Product Files, (iii) the development of entirely new point-of-sale fixtures and related materials, (iv) the planning of launch strategy and events and participation of MSO personnel (including, subject to her reasonable availability, Martha Stewart) in such events, and (iv) such other services as MSO may render in connection with the launch of Licensed Products in the Territory. The Launch Services shall be rendered in cooperation with Sears Canada and the rendering of the Launch Services by MSO shall not supersede or nullify any responsibilities of Sears Canada set forth in this Agreement.

12.3    The processes described in Articles VI, VII, VIII and IX generally contemplate the relationship between the Parties following the Launch Date, and each Party agrees to cooperate in good faith to accelerate and condense the timing elements of these processes during the period of time leading up to the Launch Date to facilitate a prompt launch of the Licensed Program and adequate provision of the Launch Services. MSO and Sears Canada shall work together to develop an appropriate timetable and allocation of responsibilities that minimizes MSO's time commitment and Sears Canada's expenditures in connection with the Launch.

## Article XIII.  Costs; Expenses

13.1    Except as otherwise stated in this Agreement or as agreed upon by Sears Canada, MSO shall be responsible for the costs of its personnel in connection with its services and activities hereunder. Sears Canada shall bear all its own expenses incurred in connection with this Agreement, as well as all other costs incurred in connection with the sourcing, design, manufacturing, distribution, marketing, advertising and sale of the Licensed Products and the Licensed Materials by Sears Canada or on Sears Canada's behalf, including, without limitation, (i) all third party costs relating to Sears Canada's exploitation of any Licensed Materials, including, without limitation, photography rights, union residuals in connection with television usage, re-edit costs, payments to illustrators, in each case whether or not Canadian rights have already been procured by MSO or another party, (ii) all costs incurred by MSO relating to the creation and transfer of Product Files and Materials Files, and (iii) all third party costs relating to

14

the Launch (but no payments for MSO personnel or related travel in connection with the Launch). Payments made by Sears Canada in connection with third party services directed by MSO or third party rights cleared by MSO shall be paid directly to MSO, unless MSO otherwise directs. Additionally, in the event MSO sends a creative representative to assist Sears Canada as permitted under Article IX hereof, Sears Canada shall reimburse MSO for the reasonable cost to MSO of such representative's assistance.

## Article XIV.  Term

14.1  This Agreement shall become effective on the date hereof, and shall continue in full force and effect until the earlier of (i) the termination of this Agreement, or (ii) the end of the fifth Agreement Year (the "Term"). Notwithstanding the foregoing, the license granted pursuant to Section 2.1 (ii), (iii) and (iv) shall not become effective until February 28, 2003 or such earlier time as the Parties may agree upon in writing. Eighteen months prior to the expiration of this Agreement, the Parties shall commence good faith discussions regarding the renewal of this Agreement for an additional term; provided, however, neither Party shall be obligated in any way to renew this Agreement.

## Article XV.   Ownership of Intellectual Property Rights

15.1  All right, title and interest in the Licensed Properties, including, without limitation, all copyrights, trademarks and other rights therein (and all renewals and extensions thereof) are and shall be owned exclusively by MSO. Subject to the terms of this Agreement, MSO shall have the sole unrestricted right to exploit the Licensed Properties in its sole discretion in any manner in perpetuity in any and all media throughout the world whether now known or hereafter devised with no further obligation whatsoever to Sears Canada or any third party. Any use which Sears Canada may be permitted to make of the Licensed Properties pursuant to this Agreement shall be subject to MSO's prior written approval.

15.2  Sears Canada confirms the sole ownership by MSO of the Licensed Properties and agrees that all use by Sears Canada of the Licensed Properties shall inure solely to the benefit of MSO and, as such, Sears Canada shall not at any time acquire any rights in the Licensed Properties or otherwise by virtue of any use or exploitation Sears Canada may make thereof, unless otherwise provided herein.

15.3  All rights in the Licensed Properties other than those specifically granted herein are reserved by MSO for its sole use and benefit and exploitation in its sole discretion. Upon the expiration or termination of this Agreement for any reason whatsoever, all rights in the Licensed Properties shall automatically revert to MSO for its sole use and disposition with no further obligation whatsoever to Sears Canada or any third party; provided, however, Sears Canada shall have three months from the expiration or termination of this Agreement to sell all units of Licensed Products purchased or ordered before expiration or termination of this Agreement and to use the associated Licensed Materials approved pursuant to this Agreement prior to such expiration or termination to accomplish such sell-off; and further provided that Sears Canada and its Affiliates shall make its inventory purchases of Licensed Products in a manner reasonably intended, in light of the circumstances surrounding the termination of the Agreement, to result in an exhaustion of inventory of Licensed Products at or around the date of termination of the

Agreement. MSO shall be paid royalties on all such Sales at the applicable rates under this Agreement.

15.4    Sears Canada agrees to promptly inform MSO of any use by any person or entity of a trademark, servicemark or design which comes to the attention of Sears Canada and which Sears Canada has reason to believe could infringe the Licensed Properties. MSO shall have the sole right to determine whether or not any action shall be taken on account of any infringement and Sears Canada shall join in such action at Sears Canada's expense if MSO so requests. Sears Canada shall have no right to take any action with respect to the Licensed Properties without prior written approval from MSO, which approval shall not be unreasonably withheld. MSO and Sears Canada shall share any award of damages net of costs including, without limitation, attorneys' fees and disbursements, as a result of such actions, in proportion to their respective damages suffered by such infringement. MSO agrees that it will take commercially reasonable efforts to protect the Licensed Properties in the Territory.

15.5    Nothing contained herein shall be construed as an assignment or grant to Sears Canada of any right, title or interest in or to the Licensed Properties, it being understood that all rights thereto are reserved exclusively by MSO, except for the license granted hereunder as specifically described herein.

15.6    Sears Canada agrees that it will not offer collections or assortments of products that are substantially similar to analogous collections or assortments of Licensed Products offered during the Term, such as would be reasonably likely to cause confusion in the minds of the consumer between the collections or assortments.

15.7    All designs, concepts, patterns, names and other intellectual property (including copyright rights) in all Licensed Products and Licensed Materials and in any products or materials developed by MSO but not ultimately approved by the Parties pursuant to Articles VII or VIII hereof shall be owned by MSO. All designs, concepts, patterns, names and other intellectual property (including copyright rights) in any products or materials developed by Sears Canada but not ultimately approved by the Parties pursuant to Article VII or VIII hereof shall be owned by Sears Canada, excluding any derivative works embodying any discreet and identifiable elements that are original to the Licensed Products, the MSO Materials, the Kmart Products or any other intellectual property owned by MSO or MSLO.

15.8    Sears Canada agrees that all use of the Licensed Properties by Sears Canada shall be in the form and manner as is approved by MSO, and there will appear on all Licensed Products and Licensed Materials, such legends, markings and notices as may be reasonably deemed necessary by MSO for protection under trademark, copyright or other applicable laws.

15.9    Notwithstanding anything else in this Article XV, the Parties acknowledge that certain third parties may own rights in certain of the Kmart Products, the Licensed Products, the Kmart Materials and the Licensed Materials, including, without limitation, photographers and illustrators. The allocation of rights described in this Article XV is intended to represent a relative allocation of rights as between MSO and Sears Canada, subject, in all cases, to applicable rights of third parties. Whenever either Party engages third parties in connection with the development of new materials and/or products pursuant to this Agreement, they shall secure as comprehensive rights from such third parties as is practicable and standard in the industry,

16

including, without limitation, re-use options. MSO agrees that it will take commercially reasonable efforts to notify Sears Canada in the event that there are any elements of the Kmart Products or Kmart Materials that Sears Canada is not free to exploit as a result of any third party rights.

## Article XVI.   Representations and Warranties

16.1   <u>By MSO</u>.  MSO represents and warrants to Sears Canada that (i) it is a wholly owned subsidiary of MSLO, (ii) it has the full right and authority to enter into this Agreement and the relationship contemplated herein and to grant the licenses granted hereunder, and (iii) Sears Canada's authorized use of the Trademarks shall not infringe or violate the rights of any third parties.

16.2   <u>By Sears Canada</u>. Sears Canada hereby represents and warrants to MSO that (i) it has the full right and authority to enter into this Agreement and the relationship contemplated herein, (ii) the manufacture, distribution, marketing, sale and use of the Licensed Products shall not violate or infringe upon any rights whatsoever of any third party (except as a result of a breach of MSO's representations and warranties), (iii) the Licensed Products (including any labeling thereon) will conform in all respects to, and satisfy applicable requirements of, applicable Canadian laws, orders and regulations, and (iv) Sears Canada has sufficient systems to accurately track, and that it will accurately track, all Sales.

## Article XVII. Indemnification

17.1    Sears Canada agrees to defend, indemnify and hold harmless MSO and its officers, directors, members, shareholders, employees and representatives from, in respect of and against any and all claims, losses, liabilities, expenses (including, without limitation, reasonable attorneys' fees and disbursements), judgments, damages, demands, lawsuits or similar actions or proceedings ("<u>Claims</u>") arising out of the breach of any of Sears Canada's representations, warranties or covenants hereunder or out of the manufacture, design, purchase, promotion, advertising, distribution, use or sale of Licensed Products, including, without limitation, any claims for product liability, other than any Claim based primarily on a breach of any representation, warranty or covenant of MSO (a "<u>Sears Canada Claim</u>").  MSO agrees to notify Sears Canada within a reasonable time after it receives notice of any Sears Canada Claim and Sears Canada shall promptly assume MSO's defense thereof either directly or through counsel to any relevant vendor. MSO shall have the right to participate in the defense of any Sears Canada Claim with counsel of its choosing and at MSO's expense. Any settlement that affects the Licensed Properties or otherwise contains a remedy other than the payment of money damages by Sears Canada (which in any way impacts upon MSO) must be approved in writing in advance by MSO.

17.2    MSO agrees to defend, indemnify and hold harmless Sears Canada and its officers, directors, shareholders, employees and representatives from, in respect of and against any and all Claims arising out of the breach of any of MSO's representations, warranties or covenants hereunder, other than any Claim based primarily on a breach of any representation, warranty or covenant of Sears Canada (an "<u>MSO Claim</u>").  Sears Canada agrees to notify MSO within a reasonable time after it receives notice of any MSO Claim and MSO shall promptly assume Sears Canada's defense thereof. Sears Canada shall have the right to participate in the

17

defense of any MSO Claim with counsel of its choosing and at Sears Canada's expense. Any settlement that contains a remedy other than the payment of money damages by MSO (which in any way impacts upon Sears Canada) must be approved in writing in advance by Sears Canada.

### Article XVIII.  Insurance

18.1    Sears Canada shall maintain in full force and effect comprehensive general liability insurance (the "Insurance"), including, without limitation, product liability insurance, covering all Licensed Products sold by it as well as any liability on its part or the part of MSO in the amount of at least $25,000,000 per occurrence and $100,000,000 in the aggregate. The Insurance shall be placed with an insurer or insurers of recognized worth and reputation, duly licensed to carry on the business of insurance in all parts of the Territory and shall name Martha Stewart, MSO, its officers, directors, employees, representatives or agents as additional insureds, for coverage against all forms of liability for death or injury to any individual, and for loss or damage to property. The Insurance shall provide for primary coverage and not contributory coverage, notwithstanding any other insurance that MSO may obtain or maintain. The Insurance shall provide for prior written notice to MSO of cancellation, lapse or material change in the Insurance and Sears Canada shall provide MSO with a certificate of insurance as evidence of the Insurance prior to, or as soon as practicable after, the execution hereof.

### Article XIX.  Sales Projections

19.1    Schedule 19 sets forth the initial projections for annual Sales relating to the Licensed Products through the Term as of the date hereof (the "Projections").   Sears Canada agrees to use its reasonable best efforts to maximize Sales.

### Article XX.  Early Termination

20.1    This Agreement may be immediately terminated by either Party in the event of a material breach hereof by the other Party continues uncured for a period of 30 days after written notice thereof, provided, however, such cure period shall be 15 days with respect to payments due hereunder.

20.2    Sears Canada and MSO shall each have the right, on written notice to the other, to terminate this Agreement if the other Party files a petition in bankruptcy, or is adjudicated a bankrupt, or if a petition in bankruptcy is filed against it and is not dismissed within (60) days thereafter, or if it becomes insolvent, or makes an assignment for the benefit of creditors, or files a petition or otherwise seeks relief under or pursuant to any federal or state bankruptcy, insolvency or reorganization statute or procedure, or if a custodian, receiver or trustee is appointed for it or a substantial portion of its business or assets (and such receivership is not discharged within sixty (60) days thereafter).

20.3    In the event of termination or expiration of this Agreement, all rights granted hereunder shall terminate and revert to MSO for its sole use and disposition without any further obligation to Sears Canada.

### Article XXI.  Services

18

21.1   MSO assumes no liability whatsoever for service, defects or breach of warranty or any type of product liability claim whatsoever regarding Licensed Products (other than any that primarily arises out of a breach of a representation or warranty of MSO). In the event that an ultimate purchaser of such a Licensed Product or any other third party claims it to be defective, in breach of warranty or in need of service, Sears Canada or its vendor shall assume all obligations, liability, cost and expense relating in any manner to such Licensed Product including, without limitation, any claimed defect, breach of warranty or service need.  In the event any such Licensed Product is returned to MSO on account of any claimed defect, breach of warranty or service need, MSO shall promptly notify Sears Canada regarding such Licensed Product and claim and shall forward the same within a reasonable time to a reasonable destination designated by Sears Canada for handling of the returned Licensed Product by Sears Canada or its vendor. Sears Canada agrees to reimburse MSO for all reasonable costs incurred in connection with such returns.  Sears Canada agrees to keep MSO timely informed of any material problems with any Licensed Product and shall meaningfully consult with MSO in a timely fashion in the event Sears Canada and/or any vendors of Licensed Products interact with the Canadian Standards Association.

### Article XXII.  Brand Consistency

22.1   Sears Canada shall use commercially reasonable efforts to develop a merchandising program in Canada relating to the Licensed Products that is consistent with the brand image and goodwill of the Trademark in the United States and Canada.

### Article XXIII.  Assignment

23.1   No Party may assign any right or obligation under this Agreement, other than the right to receive money, to any person or entity other than a purchaser of all or substantially all of the assets of a Party, without the express written consent of the other Party, provided that MSO shall have the right to assign its interests under this Agreement to any entity in which Martha Stewart owns a majority of the equity, and which at or about the time of such assignment acquires the rights to the Licensed Properties licensed to Sears Canada hereunder. Notwithstanding the foregoing, in the event either Party enters into a transaction in which it sells or otherwise conveys substantially all of the assets relevant to such Party's performance of its obligations hereunder, the other Party shall have the right to compel assignment of this Agreement as part of such transaction. Each Party shall have the right to cause any of its contractual obligations hereunder to be fulfilled by an Affiliate of such Party, and any such fulfillment shall be deemed a fulfillment of such obligation by the obligated Party, provided that the performance by such Affiliate does not reduce the level of performance that would reasonably have been rendered had such obligation been fulfilled directly by the obligated Party.

### Article XXIV.  Miscellaneous

24.1   Except to the extent required under applicable law or regulation, the Parties agree that all press releases or other publicity relating to the existence or substance of the business relationship contemplated herein shall be coordinated between the Parties and will not be released without mutual agreement. Notwithstanding the foregoing, the Parties agree that the release or releases announcing the relationship established by this Agreement shall occur at a

time reasonably determined by MSO and Sears Canada in light of their overall merchandising strategy and public disclosure obligations.

24.2    In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, then such provision shall be interpreted in the manner that best reflects the apparent intentions of the Parties and yet negates the element that rendered such provision illegal, unenforceable or void, or, if such an interpretation is impracticable or impossible, then this Agreement shall continue in full force and effect without such provision; provided that such interpretation or severance, as the case may be, shall not be effective if it materially and adversely changes the economic benefits of this Agreement to any Party and such Party objects to such interpretation or severability.

24.3    Neither Party shall be or be deemed to be an agent, employee, partner or joint venturer of or for the other Party.

24.4    All notices under this Agreement shall be in writing and shall be given by either Party by certified mail, guaranteed express mail or facsimile (confirmation of delivery received) as follows:

If to MSO:

MSO IP Holdings, Inc.
11100 Santa Monica Boulevard
Suite 600
Los Angeles, California 90025

with a copy to:

Howard Shire, Esq.
Kenyon & Kenyon
One Broadway
New York, New York  10004

and:

Martha Stewart Living Omnimedia, Inc.
11 W. 42nd Street
New York, New York  10036
Attention: General Counsel

If to Sears Canada:

Sears Canada Inc.
222 Jarvis Street
Toronto, Ontario M5B 2B8
Attention: Secretary

Facsimile No.  (416) 941-2321

20

Either Party may change its address for official notice pursuant to this Agreement by proper notice to the other Party.

24.5    After the date hereof, each of Sears Canada and MSO (i) shall hold and shall cause its officers, directors, employees, agents, accountants, representatives and advisors ("Representatives") to hold in strict confidence all the terms of this Agreement and all information furnished to such Party or its Representatives in connection with the transactions contemplated by this Agreement as well as information concerning the other Party contained in analyses, compilations, studies or other documents prepared by or on behalf of such Party (collectively, the "Information"); provided that the Information shall not include any information which has become  (A)  generally available to the public other than as a result of a disclosure by such Party or such Party's Representatives, (B) available to such Party on a non-confidential basis from a source other than the other Party or the agents of one of them if such source is to such Party's knowledge entitled to disclose such information, or (C) independently acquired or developed by such Party; and (ii) shall not, without the prior written consent of the other Party, release or disclose any Information to any other person, except (A) to such person's Representatives who need to know the Information in connection with the consummation of the transactions contemplated by this Agreement, who are informed by such person of the confidential nature of the Information and who are caused by the relevant Party to comply with the terms and conditions of this Section 24.5,  and (B) as may be required by applicable law, regulations or legal processes (including, without limitation, any disclosures of Information which are required to be made by applicable securities laws in connection with any financing activities of either Party or standard disclosure requirements under the Securities Exchange Act of 1934, as amended). The parties hereto agree to cooperate with respect to a joint press release announcing the execution of this Agreement.

24.6. This Agreement shall be the final and complete agreement between Sears Canada and MSO with respect to the subject matter hereof. No representations, inducements, premises or understandings exist in relation to the subject matter hereof, whether oral or written, except as expressly set forth herein, and this Agreement shall supercede all prior understandings, agreements, contracts or arrangements between the parties, whether oral or written, unless otherwise expressly incorporated herein. No agreement or other understanding purporting to add to or to modify the terms and conditions hereof shall be binding unless agreed to by the parties in writing. Any terms or conditions in any forms of the parties used in the performance of this Agreement which are in conflict with the terms and conditions hereof shall be void.

24.7    This Agreement shall be construed and enforced in accordance with laws of the State of New York, U.S.A.. With respect to any suit, action or proceeding relating to this Agreement ("Proceedings"), each Party irrevocably (i) submits to the jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such Party.

21

24.8 The following provisions of this Agreement shall survive expiration or termination of this Agreement: Articles I, IV, V, XV, XVI, XVII, XVIII (for one year following termination), XXI and XXIV.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

SEARS CANADA INC.

By: _____
Name:
Title: Chairman / CEO

By: _____
Name: K. Vezei
Title: Secretary

MSO IP HOLDINGS, INC.

By: _____
Name: Sharon Lee Patrick
Title: Executive Vice President

23

## Schedule 1(a)  Application Sheet

[To be developed and agreed upon following execution of the agreement, but should contain sufficient information for MSO to make approval decisions, including, without limitation, design and manufacturing specifications, product categories and type, intended pricing information and launch schedules, vendor identity, country of origin, packaging specifications, etc].

## Schedule 1(b)  Exclusive Category Products

### Soft Home Products

BED ROOM
- Sheets
- Mattress pads
- Slip covers
- Pillows
- Pillow cases
- Pillow shams
- Comforters
- Quilts
- Bed Spreads
- Bed Skirts
- Duvet/comforter covers
- Blanket/throws
- Coordinating window treatments
- Coordinating decorative borders and wallpaper
- Coordinating rugs

BATH
- Towels (sheet, beach, bath, hand and wash cloth)
- Shower Curtains
- Coordinating bath rugs
- Bath accessories (tooth brush holder, lotion dispenser, soap dish, tumbler, tissue cover, etc.)
- Waste baskets
- Coordinating window treatments
- Coordinating decorative borders and wallpaper

KITCHEN
- Towels
- Pot holders
- Dish Cloths
- Tablecloths
- Napkins/Napkin rings
- Chairpads
- Placemats
- Coordinating decorative borders and wallpaper
- Coordinating window treatments (curtains, valances, fabric shades, vertical blinds, mini blinds, decorative hardware, drapery, panels, swags, tab tops, top treatments, tiers)
- Coordinating rugs

GENERAL SOFT HOME
>    Window treatments (valances, mini blinds, decorative hardware, tab tops, top treatments, tiers)
>    Decorative pillows
>    Home Fragrances
>    Closet Organizers

SEASONAL HOME TEXTILES

HOME TEXTILES FOR BABIES

## Garden Products

OUTDOOR/GARDEN FURNITURE

WATERING EQUIPMENT

LONG HANDLE GARDEN TOOLS

SHORT HANDLE GARDEN TOOLS

GARDEN CUTTING TOOLS

GARDEN GLOVES

SOILS

PEST CONTROL

GARDEN STORAGE & CARRIERS

GARDEN ACCESSORIES

PLANT POTS

GRILLING

OUTDOOR LAWN DECORATION

FALL BULBS

SPRING BULBS

SEED STARTING

WATER GARDENING

SEEDS

LIGHTING

## Housewares Products

HOME
>   Dinnerware (ceramic, glass, enamel)
>   Flatware
>   Glassware (glass, plastic)
>   Decorative Accessories
>   Lamps and shades
>   Picture Frames
>   Candles

FOOD
>   Kitchenware

KEEPING
>   Closet Accessories
>   Hangers
>>      Plastic
>>      Wood
>>      Metal
>   Cedar Products/Moth Protection
>   Clothing Storage -- Bags and Boxes
>>      Shoes
>>      Sweaters
>>      Blankets
>>      Hanging
>   Closet Shelving Organization Systems
>   Laundry Organization Items
>   Underbed Storage Containers
>   Wire and Cable Ties
>   Kitchen Organization Containers
>   Kitchen Labels
>   Dish Storage Containers
>   Dish Felt Pads
>   Floor Savers
>   Food Storage Containers
>   Kitchen Containers
>   Shelf Paper
>   Trash Receptacles
>   Recycling Receptacles

# SEASONAL VARIATIONS OF HOUSEWARES PRODUCTS

## Seasonal Products

**ARTIFICIAL CHRISTMAS TREES/STANDS**
- 4' trees
- 6'/6.5' trees
- 7'/7.5' trees
- tree stands
- tree containers

**CHRISTMAS ORNAMENTATION**
- ornaments: basic and novelty
- specialty tree accessories
- garland: beaded, tinsel, illuminated, and other
- tree tops
- tree skirts

**CHRISTMAS LIGHTING**
- 50 ct lights
- 100 ct lights
- fancy lights
- c7/c9 lights
- specialty lights
- replacement fuses/bulbs
- lighting accessories

**HOME CHRISTMAS DECORATIONS**
- porcelain houses
- porcelain figurines
- porcelain house accessories
- porcelain sets
- indoor/outdoor figurines
- tabletop ornaments
- live & artificial wreaths
- stocking holders/stockings
- artificial snow

**SPECIALTY CHRISTMAS ELECTRONICS**
- animation
- specialty electronics

**CHRISTMAS GIFT WRAP & GIFT CARDS**
- gift wrap
- gift boxes
- gift bags/tissue
- ribbons/bows
- gift tags/seals
- gift cards

## Schedule 1(c)  New Category Products

Furniture (of a lower intended price point than the Martha Stewart Signature program currently under development)

Tools

Infant Apparel

[Other categories to be proposed by Sears in which Sears currently conducts a material amount of business and which is reasonably compatible with the Martha Stewart brand]

## Schedule 4  Royalty Rates for Each Agreement Year

| Agreement Year | Royalty Rate |
|---|---|
| 1 | 3% of Sales |
| 2 | 3% of Sales |
| 3 | 3.1% of Sales |
| 4 | 3.1% of Sales |
| 5 | 3.1% of Sales |

## Schedule 5.3  Minimum Royalty Amounts

| Agreement Year | Minimum Royalty Amounts |
|---|---|
| 1 | $3,600,000 |
| 2 | $3,375,000 |
| 3 | $4,882,000 |
| 4 | $5,370,000 |
| 5 | $5,905,000 |

**Schedule 7.2  Form of Vendor Agreement**

## MARTHA STEWART LIVING OMNIMEDIA, INC.
### 11 West 42nd Street
### New York, New York 10036

As of _____

[Vendor Name and Address]

Re:    "Martha Stewart Everyday"

Dear _____:

As you know, you may soon be, or have been, manufacturing products to be sold under the "Martha Stewart Everyday" brand.  Although these products will be and/or have been manufactured by you pursuant to agreements between you and certain retailers, you recognize that such retailers have made this agreement a condition to your manufacturing "Martha Stewart Everyday" products (the "Products") for them.  Accordingly, in consideration of your selection, or potential selection, to manufacture certain Products, you hereby agree with Martha Stewart Living Omnimedia, Inc. ("MSO") as follows:

1.    For the purposes of this Agreement, "Proprietary Materials" shall mean all (i) information or material, whether or not in tangible form, relating to MSO or Martha Stewart or which is supplied to you by MSO, or which is supplied to you by an Approved Retailer (as hereafter defined) in connection with the Products, other than  (A) any such information known to you, or material in your possession, prior to the commencement of your discussions regarding the manufacture of Products with any Approved Retailer or MSO, as the case may be, (B) any such information generally known to, or such materials generally possessed by, the public at large (other than as a result of (X) a breach of this agreement by you, (Y) distribution of the Products, or (Z) the acts of any other party which you know, or have reason to know, is under an obligation of confidentiality to MSO), and (C) any such information or material acquired by you from a third party (other than a third party which you know, or have reason to know, is under an obligation of confidentiality to MSO or who acquired such information or material as a result of the distribution of the Products), (ii) materials, whether or not in tangible form, which you develop with MSO or with any contribution, input, advice or direction whatsoever from MSO (the "Vendor Materials") (for the sake of clarity, Vendor Materials shall include the entire applicable material, not just the portion developed with MSO's contribution, input, advice or direction), and (iii) information or materials, whether or not in tangible form, with respect to which you gain access or knowledge as a direct result of (A) your relationship relating to the Products with an Approved Retailer or MSO, as the case may be, or (B) carrying out any of your obligations to MSO or an Approved Retailer relating to the Products.  Notwithstanding the foregoing,

the Proprietary Materials shall include any Materials (as defined below) in which MSO owns any proprietary rights (including, without limitation, any copyright rights, trademark rights, or other intellectual property rights).

The Proprietary Materials may include, but are not necessarily limited to, the following: concepts; techniques; data; documentation; research and development; customer lists; advertising plans; distribution networks; new product concepts; intellectual property of all types, including, without limitation, designs, patterns, ideas, and any physical manifestations thereof; prints; sketches; planned introduction dates; processes; marketing procedures; "know-how"; marketing techniques and materials; development plans; names and other information related to strategic partners, suppliers, or vendors; pricing policies and strategic, business or financial information, including business plans and financial pro formas (all of the foregoing, "Materials").

Notwithstanding the foregoing, the Proprietary Materials shall not include materials you develop at your sole cost and expense with no contribution, input, advice or direction whatsoever from MSO (the "_____ Materials"); provided, however, that no _____ Materials may in any way contain, embody or reference any Proprietary Materials, including, without limitation, any MSO trademark, servicemark, mark, name or other designation.

For purposes of this Agreement, "Approved Retailers" shall mean those entities set forth on Exhibit A hereto, which exhibit may be amended from time to time by MSO.

2.    You acknowledge that MSO exclusively owns, in perpetuity and throughout the world, all right, title and interest, including, without limitation, all copyrights, trademarks and other proprietary rights (and all renewals and extensions thereof) embodied in, or related to, the Proprietary Materials, and any and all good will therein. You recognize the great value of the publicity and good will associated with the Proprietary Materials and acknowledge that such value and good will belongs exclusively to MSO. You agree that you shall not acquire any rights in or to the Proprietary Materials by virtue of your performance of any obligations to MSO or any Approved Retailer or otherwise. Any use which you may make of the Proprietary Materials shall solely be pursuant to your agreements with MSO or the Approved Retailers in connection with the Products and shall not restrict, limit or otherwise diminish MSO's rights therein with respect to any other products or use. You hereby acknowledge and agree that the Vendor Materials shall be and/or have been solely created by you as a "work-made-for-hire" specially commissioned by MSO for use in connection with the Products pursuant to the United States Copyright Act, and any and all extensions and/or renewals thereof, it being understood that in the event any of the Vendor Materials are determined not to be a "work-made-for-hire", then you hereby irrevocably assign to MSO all rights therein. You represent and warrant that (i) you shall not undertake or cause any third party to undertake any act that violates, infringes, diminishes, challenges or otherwise conflicts with MSO's exclusive ownership of all rights, title and interest in and to the Proprietary Materials, and (ii) that MSO's

exploitation of the Vendor Materials shall not infringe the rights of any third party.

1. All notes, data, reference materials, sketches, drawings, memoranda, documentation and records in any way incorporating or reflecting any of the Proprietary Materials shall belong exclusively to MSO and you agree to turn over all copies of such materials in your possession or control to MSO upon the earlier of MSO's request or termination of the final agreement pursuant to which you manufacture any Products.

2. You shall hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any of the Proprietary Materials in any form to any person or entity, nor shall you utilize any of the Proprietary Materials for any purpose, except in each case as may be necessary in the course of your manufacture of Products, provided that no Proprietary Materials which are designated as being "confidential" by MSO may be revealed, reported, published, disclosed or transferred without the express written consent of MSO. You shall cause each of your employees, agents or representatives that is provided access to any Proprietary Materials to abide by the same obligations and restrictions to which you are subject hereunder.

3. You agree that you shall not sell any products incorporating any of the Proprietary Materials to any entity other than MSO or an Approved Retailer, except as expressly permitted herein.

4. Upon receipt of a notice from MSO or an Approved Retailer that any Products manufactured by you are deficient in quality or are not consistent with the relevant specifications, or in the event of an Overrun (as hereafter defined), you may sell such deficient Products or Products with respect to which there has been an Overrun (collectively, "Excess Products") to parties other than Approved Retailers, provided that (i) no use of or reference to the name Martha Stewart, MSO or any variation thereof is used in connection with any advertising, publicity, labeling, wrapping or packaging with respect to any such sales, (ii) that prior to making any such sale you receive assurances from the party to whom you sell such Excess Products that they will comply, and will cause any subsequent purchasers to comply, with the terms of sub-clause (i) above, and (iii) that such sales are made to purchasers who have warranted to you in writing that they shall only re-sell the Excess Products outside of North America (unless prior approval for North American sales is received from MSO or the Approved Retailer for whom the Excess Products were originally manufactured). For purposes of this Agreement, there shall be an "Overrun" on a Product only in the event that (1) you have received notice from all Approved Retailers for whom you manufacture such Product that such Approved Retailers do not intend to purchase any more of such Product from you in the future, (2) you have delivered to the relevant Approved Retailers and to MSO the amount of Product in your possession with respect to which there is an Overrun, and (3) MSO and the relevant Approved Retailers have approved the quantity of such Overrun. MSO and the Approved Retailers may, in their sole discretion, limit the amount of Excess Product you may dispose of pursuant to the terms of this paragraph if they determine that the

amount of such Products that you have on hand for such disposal is excessive and beyond the quantity you would have possessed had you followed a normal and prudent manufacturing schedule.

5.    In the event that you receive a request to disclose any Proprietary Materials under a subpoena or court order, you will (a) promptly notify MSO thereof, (b) consult with MSO on the advisability of taking steps to resist or narrow such request, and (c) if disclosure is required or deemed advisable, cooperate with MSO in any attempt that it may make to obtain an order or other reliable assurance that confidential treatment will be accorded to designated portions of the Proprietary Materials.

6.    Because of the unique nature of the Proprietary Materials and your other obligations hereunder, you understand and agree that MSO will suffer irreparable harm in the event that you fail to comply with any of your obligations hereunder and that monetary damages may be inadequate to fully compensate MSO for such breach. Accordingly, you agree that MSO will, in addition to any other remedies available to it at law or in equity, be entitled to injunctive relief, including, without limitation, temporary restraining orders and/or preliminary injunctions, to enforce the terms of this Agreement. In the event of any breach or purported breach by MSO hereunder, your rights shall be limited to an action at law for money damages actually suffered. In no event shall you be entitled to rescission, injunction or other equitable relief of any kind.

7.    In case any one or more of the provisions (or portions of the provisions) of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions (or portions of the provisions) of this Agreement and this Agreement shall be construed as if the invalid, illegal or unenforceable provisions (or portions of the provisions) had never been contained therein.

8.    In the interest of being guided by a well-developed body of law in the event of a dispute, the parties agree that this Agreement, including the validity and enforceability hereof, shall be interpreted in accordance with the laws of the State of New York pertaining to agreements made and performed therein, and the courts located in the State of New York, County of New York (federal, if jurisdiction is present, state, if federal jurisdiction is lacking), shall have exclusive jurisdiction and venue over all disputes hereunder.

Upon execution hereof by your authorized signatory, this letter shall constitute a binding agreement between you and MSO, enforceable according to its terms.

Sincerely yours,

MARTHA STEWART LIVING OMNIMEDIA, INC.

By:_____
   Name:
   Title:

ACCEPTED AND AGREED BY:

_____

By:_____
  Name:
  Title:

EXHIBIT A

[Approved Retailers]

## Schedule 17  Initial Projections of Annual Sales

| Agreement Year | Projections |
|---|---|
| 1 | $120,000,000 |
| 2 | $150,000,000 |
| 3 | $210,000,000 |
| 4 | $231,000,000 |
| 5 | $254,000,000 |

Nov 05 2007 11:24AM HP LASERJET FAX                                    P.3

Case 1:07-cv-09840-DLC    Document 3    Filed 11/09/2007    Page 52 of 53
                                                    02:47:55 p.m.    04-25-2005    3/4
4169612321        Sears Canada Inc.

## TERM SHEET

### PROPOSED AMENDMENTS TO
### LICENSE AGREEMENT MADE AS OF APRIL 27, 2002 BETWEEN
### MSO IP HOLDINGS, INC. ("MSO") AND SEARS CANADA INC. ("Sears Canada")
### (the "Agreement")

Further to our meeting held on Thursday, March 3, 2005 at Sears Canada's offices and as you have requested, we are pleased to summarize below the essential proposed changes to the Agreement. The changes will be subject to a formal amendment to the Agreement which we expect to finalize prior to end of May, 2005. We look forward to receiving your response and hope to reach an amicable solution for our mutual benefit. All capitalized terms used below shall have the meaning given to them in the Agreement unless otherwise defined herein.

**1.      Agreement Year 1 – Minimum Royalty Amount**

Notwithstanding the royalties and the Minimum Royalty Amount payable by Sears Canada for Agreement Year 1 as per the terms of the Agreement, MSO acknowledges and agrees that the amount of $2,448,000 (CDN) (less the withholding tax paid to the Canada Revenue Agency), which has been paid by Sears Canada to MSO, will be in full satisfaction of the royalties and the Minimum Royalty Amount payable by Sears Canada for Agreement Year 1 and there shall be no other royalty payments due or owing by Sears Canada in respect of Sales for Agreement Year 1.

**2.      Royalty Rates**

The royalty rates for Agreement Years 2 to 5 inclusive will remain as per Schedule 4 of the Agreement.

**3.      New Minimum Royalty Amounts**

For Agreement Years 2 to 5 inclusive, the Minimum Royalty Amounts set forth in Schedule 5.3 of the Agreement will be eliminated. Instead, Sears will pay to MSO the following new guaranteed royalty amounts for Agreement Years 2 to 5 inclusive, at the royalty rates set forth in Schedule 4 at the Agreement, based on the restated projected net sales set out below:

| Agreement Year | Restated Projected Net Sales (CDN Dollars) | Royalty Rate | New Guaranteed Royalty Amounts |
|---|---|---|---|
| Year 2 | $81,750,000 | 3% | $2,452,500 |
| Year 3 | $91,666,000 | 3.1% | $2,841,646 |
| Year 4 | $100,111,226 | 3.1% | $3,103,448 |

5189412321        Sears Canada Inc.

| Agreement Year | Restated Projected Net Sales (CDN Dollars) | Royalty Rate | New Guaranteed Royalty Amounts |
|---|---|---|---|
| Year 5 | $109,445,828 | 3.1% | $3,392,821 |

**4.     K-Mart Termination (Article XX)**

The discussions surrounding this aspect of the Agreement, as outlined in our October 18, 2004 letter, continue to be a matter of interest to Sears Canada. However, in light of the recent merger transactions involving Sears, Roebuck and Co. and Kmart Holding Corporation, we should agree to defer this topic to a future discussion, if necessary.

**5.     Performance Commitment**

MSO will be committed to maintain an adequate level of personnel, consistent with past practices, to meet its obligations under the Agreement.

Dated this 25th day of April, 2005

Nina MacLaverty
Vice President, Home & Hardlines
Sears Canada Inc.

Agreed to and accepted this 30th day of April, 2005

Name:    Jay L. Dubiner
Title:    Executive Vice President, Corporate Development & General Counsel
MSO IP HOLDINGS, INC.

2